IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHAWN P. LEWIS,                          )
                  Plaintiff,               )
                                              )
     vs                                     )        Civil Action No. 17-1409
                                               )
MID-CENTURY INSUANCE COMPANY, a          )        Magistrate Judge Mitchell
wholly-owned subsidiary of FARMERS       )
INSURANCE GROUP,                         )
                  Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Shawn P. Lewis, brings this action under Pennsylvania law against Defendant,

Mid-Century Insurance Company, a wholly-owned subsidiary of Farmers Insurance Group

("Mid-Century"), alleging claims of breach of contract and bad faith arising out of Mid-

Century's handling of his claim for uninsured motorist's ("UM") benefits following a motor

vehicle accident which occurred on October 22, 2013.

Presently before the Court is a motion for partial summary judgment, filed by the

Defendant with respect to the bad faith claim alleged in Count II of the Complaint. Plaintiff has

filed a brief in opposition and Defendant has filed a reply brief and the motion is ripe for

disposition. For the reasons that follow, the motion will be denied.

Facts

Plaintiff alleges that, at the time of the accident, he was driving his vehicle on McGovern

Boulevard at the intersection of Stoops Ferry Road in Moon Township, Pennsylvania, when he

was struck by another vehicle that was attempting a left-hand turn. (Compl. ¶¶ 7-8.)[1] According

to the police report, Angela Craft made an improper left turn and failed to yield the right of way

---

[1] Notice of Removal (ECF No. 1) Ex. 2.

to Plaintiff's vehicle. (Def.'s App. Ex. B.)[2] Craft was uninsured at the time of the accident. (Def.'s App. Ex. D.) The adjustor determined that Craft was 100% liable for the collision. (Def.'s App. Ex. E at 38.)

At the time of the accident, Plaintiff was covered by a policy of automobile insurance, No. 0619563-65-23, issued by Defendant Mid-Century. (Def.'s App. Ex. C.)[3] The Policy provided, among other things, UM benefits of $100,000.00, with stacking for four vehicles, for total UM benefits of $400,000.00. (Id. at 1.)

Plaintiff's Medical Treatment

Following the collision, Plaintiff immediately felt pain in his neck. After his vehicle was towed from the scene, Plaintiff presented to Heritage Valley Sewickley Hospital. He complained of neck and back pain. X-rays of his spine were negative and he was discharged with a prescription for pain medication and instructions to follow up with his primary care physician. (Pl.'s App. Ex. 11.)[4] Thereafter, Plaintiff began treating with physical therapy and a pain management specialist, Edward Heinle, M.D. through March of 2014. (Pl.'s App. Ex. 12.) Subsequently, Plaintiff began treating with a new pain specialist, Mark LoDico, M.D. Dr. LoDico ordered an MRI of Plaintiff's cervical spine on June 24, 2014. The MRI showed small bulges at C3-4, C4-5, and C5-6 and large disc protrusion at C6-7. Following these findings, Plaintiff received epidural steroid injections in his C5-6 on July 17, 2014 and July 31, 2014. Plaintiff received only temporary relief from these injections and continued to have substantial cervical pain. As a result, Dr. LoDico performed five (5) cervical facet nerve blocks between

---

[2] ECF No. 39.

[3] Somewhat bizarrely, despite having submitted what it designates as the Policy as Exhibit C to its motion, Defendant has attached a different document to its Reply Brief (ECF No. 52, Ex. QQ) which it contends is the policy in effect at the time of the accident. This issue will be discussed further below.

[4] ECF No. 44.

November 2014 and January 2015. On February 19, 2015, Dr. LoDico performed a cervical facet rhizotomy. (Pl.'s App. Ex. 13.)

From January 15, 2015 through May 22, 2015, Plaintiff attended twenty-eight physical therapy visits at NovaCare Rehabilitation. Again, Plaintiff experienced only minimal relief. (Pl.'s App. Ex. 14.)  Due to Plaintiff's continued pain and discomfort in his neck, he was referred to a neurosurgeon, David Oliver-Smith, M.D. Another cervical MRI was performed on June 30, 2015, which again showed bulges at C3-4, C4-5, and C5-6 and moderately large disc protrusion at C6-7. Another cervical MRI on October 20, 2015 depicted questionable spinal cord impingement. Based on these findings, Dr. Oliver-Smith assessed Plaintiff as a reasonable candidate for surgery and Plaintiff elected to proceed. (Pl.'s App. Ex. 15.)

On March 24, 2016, Dr. Oliver-Smith performed a C5-6, C6-7 anterior cervical discectomy and fusion with plating. Initially, the surgery was successful, but Plaintiff developed a post-operative hematoma which caused dysphagia. Dr. Oliver-Smith elected to monitor the hematoma conservatively. (Pl.'s App. Ex. 15 at 9-11.)

However, on April 15, 2016, Plaintiff returned complaining of increased pressure in his neck. He was diagnosed with a wound infection and instructed to proceed immediately to Allegheny General Hospital for a second procedure. That same day, Dr. Oliver-Smith performed an exploration and debridement of the infected wound, with a large amount of pus and purulent fluid evacuated. He elected to leave the plate and grafts in place and treat them with antibiotics. (Id. at 15-16.)

Subsequently, Dr. Oliver-Smith wrote a report dated October 6, 2016. Dr. Oliver-Smith causally connected Plaintiff's fusion surgery to the October 22, 2013 motor vehicle collision. He opined that Plaintiff will likely have permanent limitations of his physical abilities, particularly

his ability to perform physical labor, permanent chronic neck pain, elevated likelihood of future infection, and a 15% increased likelihood that additional surgical intervention would be required in the future. (Def.'s App. Ex. M at 5.)

Dr. Oliver-Smith also noted the psychological effects of Plaintiff's injuries. Prior to the collision, Plaintiff had never had any psychological or emotional issues. However, these injuries have caused Plaintiff a great amount of stress, anxiety, and depression. (Id.)

Mid-Century's Assessment of the Claim

Mid-Century received notice of the accident on October 22, 2013 and assigned it to claim representative Andrea Dykast. (Def.'s App. Ex. E at 1, 14.) Dykast called Plaintiff that same day but was unable to speak with him. The following day, she spoke with him to discuss the accident and his injuries. Plaintiff told her that he had been informed that the other driver was uninsured, that he had gone to the emergency room and that he was not sure whether he would follow up with his doctor. (Id. at 16, 19.)

Dykast spoke with Plaintiff again on October 25, 2013. He stated that he was still sore and had been out of work. She advised him to submit a doctor's note confirming his inability to work in order for his wage loss to be considered. (Id. at 24-25.) On October 31, 2013, Plaintiff reported that he had visited his family doctor and had an appointment to begin physical therapy. (Id. at 32.) On November 1, 2013, Dykast evaluated his claim, noting that the accident involved a heavy impact, that he had soft tissue injuries to his neck and back and that he would likely need physical therapy and chiropractic care. She also noted that he was self employed flipping houses and alleged that he was unable to work since the accident, but he could not say how much he made and she would need tax returns from the past three years. (Id. at 33.) She explained to him at an in-person meeting on November 7, 2013 that he would need a doctor's note and his tax

returns for the past three years in order to recover any lost wages. (Id. at 41.)

Dykast spoke to Plaintiff on December 10, 2013. Her claim file note states that he told her that he was treating with physical therapy three times a week and that "he's feeling better." (Id. at 59.) Dykast's claim file note from December 30, 2013 states that he told her that his doctors told him to work light duty and that "he is feeling a lot better." (Id. at 63.) Her note from January 24, 2014 stated that he told her he "is doing better" and that "he is just doing the stem [electrical stimulation] at home." (Id. at 70.) However, at his deposition, Plaintiff testified that "I never felt better. I just got to a certain point, and I plateaued." (Lewis Dep. 40:12-13.)[5]

Dykast's January 24 note also stated that Plaintiff indicated he "is doing what he can at work." (Def.'s App. Ex. E at 70.) Plaintiff responds that he has been unable to renovate homes since the accident and has only been able to supervise others. (Lewis Dep. 15, 18.)

Dykast noted on February 20, 2014 that Plaintiff told her that "something happened when he was riding with his dad as a passenger in his [truck] last night and [he] couldn't sleep well and neck hurts." (Def.'s App. Ex. E at 81.)[6] Defendant also cites a January 30, 2014 doctor's report in which Plaintiff indicated that he "was a restrained passenger when the driver had to stop suddenly to avoid collision. He said after that he experienced increased … cervical pain, which worsened the next day." (Def.'s App. Ex. LL.)

On March 10, 2014, Mid-Century noted that Plaintiff had exhausted the personal injury protection (PIP) coverage under his first party benefits that he had been receiving since the date of the accident. (Def.'s App. Ex. E at 85.)

On March 17, 2014, Dykast reviewed records from Heritage Valley from November 6,

---

[5] Pl.'s App. Ex. 7.
[6] Plaintiff denies this statement, but he points only to a portion of his deposition in which he states that he did not recall talking to anyone on the phone (Lewis Dep. 55).

2013 to December 10, 2013 and concluded, based on the information she had at that time, that

Plaintiff had been unable to work, but she still needed tax returns to determine his daily wage.

(Def.'s App. Ex. E at 88.) Her notes state that she spoke with Plaintiff, who told her he was

treating with a chiropractor twice a week and was "feeling better." (Id. at 91.) Plaintiff again

denies that he was feeling better. (Lewis Dep. 40.)

On March 26, 2014, Dykast reevaluated Plaintiff's UM claim, concluding that: the

accident was a heavy impact; he was diagnosed with soft tissue injuries; treatment was ongoing;

and his wage loss was unknown because a daily wage must be determined upon receipt of tax

returns. (Def.'s App. Ex. E at 91-92.) On April 21, 2014, Plaintiff's counsel called Dykast to

advise her of their representation, and at this point, the claim was reassigned to adjustor

Lyuabomir "Lenny" Paydem. (Id. at 93.) On April 22, 2014, Paydem's note states that he spoke

with a paralegal in Plaintiff's counsel's office, who told him that Plaintiff was not presenting a

wage loss claim. (Id. at 96.) However, Plaintiff testified at his deposition that he was presenting

a wage loss claim. (Lewis Dep. 17.)

On April 28, 2014, Paydem noted that he agreed with the prior adjustor's assessment that

Craft was 100% liable for the collision. (Def.'s App. Ex. E at 106.) Plaintiff states that Paydem

agreed that he was due UM benefits and the only question was what damages he suffered.

(Paydem Dep. 48:6-12.)[7] Paydem performed an evaluation of Plaintiff's UM claim, concluding

that: Plaintiff's injuries were soft tissue; he was still receiving chiropractic treatment and taking

pain killers; an MRI showed a small anterior spur at L-4 but not spondylolisthesis or instability; a

cervical spine x-ray showed slight anterolisthesis at C-5 to C-6 but no instability. He set the

initial reserve at $3,000. (Def.'s App. Ex. E at 106.) Paydem called several times seeking more

---

[7] Pl.'s App. Ex. 4.

information, and Plaintiff's counsel sent a package of medical records and bills on June 30, 2014. (<u>Id.</u> at 112; Def.'s App. Ex. G.)

During a second evaluation on May 23, 2014, Paydem estimated that the claim would have $1,000 to $2,000 of out-of-pocket loss and $1,000 to $2,000 for Plaintiff's physical injuries to his neck and upper back. No value was placed on wage loss or diminished earning capacity. He maintained his reserve at $3,000. (Pl.'s App. Ex. 8 at 111.) Paydem again evaluated Plaintiff's claim on July 11, 2014 after having reviewed additional medical records, most notably the physical therapy records from Heritage Valley Outpatient Rehabilitation and the consultations with Edward Heinle, M.D. (<u>Id.</u> at 114.) At the conclusion of his July 11, 2014 evaluation note, Paydem estimated $1,000 to $2,000 of out-of-pocket loss and $2,000 to $3,000 for Plaintiff's physical injuries. Again, no value was placed on wage loss or diminished earning capacity. He maintained his reserve at $3,000. (<u>Id.</u>)

On July 7, 2014, Paydem reviewed the records and noted that the letter indicated the records were incomplete and there was no demand at that time. He also noted that Plaintiff was evaluated by Dr. Heinle on November 6, 2013 and diagnosed with cervical/thoracic/lumbar sprain/strain and recommended physical therapy. (Def.'s App. Ex. E at 114.) Paydem's note further states that Plaintiff was treated with physical therapy from November 11, 2013 through January 6, 2014, that "Dr notes that claimant is getting better and recommends to stop therapy and continue with home exercises." (<u>Id.</u>) Plaintiff responds that Paydem testified that he based this note on a January 6, 2014 therapy note authored by Rebecca Dewees Lani (Paydem Dep. 82), but that the actual note stated that "patient is plateauing with physical therapy" and that she would "consider discontinuation to home program." (Def.'s App. Ex. JJ.) Paydem admitted that a physical therapist is not a medical doctor. (Paydem Dep. 84:11-85:4.) When asked about the

difference between considering a future discontinuation of treatment and a recommendation to stop it, Paydem testified: "They could mean the same thing." (Paydem Dep. 86:10-13.) Thus, Plaintiff argues that Paydem was conflating a future consideration to discontinue therapy due to decreasing benefit with a recommendation to end it immediately because the patient has recovered, as well as representing that a doctor, as opposed to a physical therapist, made this recommendation.

Paydem's note continued that, on January 30, 2014, Plaintiff was examined by Dr. Heinle, who stated that "Claimant notes that he has been doing better since the accident but was involved in another subsequent incident where he was a passenger and a driver stopped suddenly to avoid collision which caused him to re aggravate his neck. Dr. recommends injections and [chiropractic treatment]." (Def.'s App. Ex. E at 114.) Plaintiff responds that Dr. Heinle's actual office note stated that, after the more recent incident, Plaintiff "experienced increased … cervical pain, which worsened the next day." (Def.'s App. Ex. LL.) At his deposition, Paydem acknowledged that the person who would make the determination between increased pain and a re-aggravation would be the treating physician (Paydem Dep. 90:19-91:5), admitted that a person can experience an increase in pain without aggravating or suffering a new injury (id. at 92) and states that he would rely on the treating doctor's opinion about whether increased pain constituted an aggravation or new injury (id. at 91), but agreed that Dr. Heinle did not diagnose Plaintiff with an aggravation or new injury (id. at 90:8-11, 92:17-20). He admitted that, at the time, he had no other information about the incident other than what was contained in Dr. Heinle's note and did not even know the date the incident occurred. (Id. at 95:13-21, 96:2-4.) Nevertheless, he recorded the incident as a "new injury." (Id. at 93:9-12.)

Subsequently, Paydem interpreted the "new injury" as a "subsequent loss" and refused to

accept any care and treatment after January 30, 2014 as related to the October 22, 2013 motor vehicle accident. (Id. at 93, 120-23.) He attributed 100% of Plaintiff's condition to this alleged new injury and zero to the original motor vehicle accident. (Def.'s App. Ex. E at 133.)

Finally, Paydem noted that the records indicated that Plaintiff was working less but there was no disability slip provided. (Id. at 114.) On multiple occasions after the July 11, 2014 evaluation, Paydem sent correspondence to Plaintiff's counsel advising that he had questions and concerns regarding Plaintiff's report of a subsequent incident on or about January 30, 2014 and requesting additional information and medical records in order to complete his investigation of Plaintiff's UM claim. (Def.'s App. Ex. H.) Paydem also made numerous calls and left messages with Plaintiff's counsel's paralegal. (Def.'s App. Ex. E at 116-18, 123, 126.) On May 28, 2015, July 2, 2015 and August 10, 2015, Paydem sent letters to Plaintiff's counsel, requesting a complete set of Plaintiff's medical records and bills. (Def.'s App. Exs. I, J, K.) On November 19, 2015, upon receipt of the requested records, Paydem sent correspondence to Plaintiff's counsel acknowledging receipt of Plaintiff's demand package and requesting additional information, including health insurance information. (Def.'s App. Ex. L.)

On December 1, 2015, Paydem again evaluated Plaintiff's UM claim, concluding that he suffered soft tissue injuries and treated for them until January 30, 2014, when a subsequent incident caused an aggravation of his neck and back. (Def.'s App. Ex. E at 131-32.) Plaintiff responds that Paydem erroneously stated that "one of his doctors even recommended to stop treatment" (id. at 133) which was not true and that Paydem repeated his own interpretation that Plaintiff's "subsequent loss" caused an aggravation, a conclusion not supported by Dr. Heinle's records. Additionally, Paydem concluded that, if Plaintiff could prove that all of his injuries were related to the October 22, 2013 collision, his claim would have a value in excess of

$50,000, but Paydem refused to accept any care or treatment after January 30, 2014 as related and set a settlement range of $5,000 to $10,000 and a reserve of $10,000 (id. at 134).  At his deposition, Paydem stated that the conclusion that the second incident was a subsequent injury and that he would not accept any treatment after January 30, 2014 as related to the underlying motor vehicle accident was based on his own interpretation of the medical records (Paydem Dep. 119:1-19) and that he made it without any supporting medical expert opinion (Id. at 120:1-10, 128:9-15).

After January 30, 2014, Paydem attributed one-hundred percent (100%) of Plaintiff's condition and injuries to the subsequent loss and zero percent (0%) to the motor vehicle collision of October 22, 2013. (Paydem Dep. 123:17-22.) As far as Paydem was concerned, Plaintiff's claim for damages "ended" as of January 30, 2014. (Id. at 117:10-19.) Paydem stated that if a factfinder believed that all of Plaintiff's injuries were related to the collision, the claim would have a value in excess of $50,000. Nevertheless, he only set the top of his settlement range and his reserve ($10,000 each, respectively) at 20% of that potential valuation.

On December 1, 2015, Paydem called Plaintiff's counsel and offered $5,000 to settle the UM claim.  (Def.'s App. Ex. E at 132.)  He called counsel's office again on January 12, 2016, February 8, 2016, March 8, 2016 and April 12, 2016.  He was finally able to speak to someone on April 12, a paralegal who advised him that Plaintiff had undergone surgery.  (Id. at 135-36.)

On May 13, 2016, Paydem called back to request an update on the surgery records.  He made similar calls on July 13, 2016 and September 15, 2016.  (Id. at 136, 138.)  On October 19, 2016, three years after the accident, Plaintiff's counsel sent correspondence to Paydem enclosing a surgical report indicating that he underwent a surgical discectomy and fusion with plating at C5-6 and C6-7 on March 24, 2016.  Counsel made a demand for Plaintiff's UM policy limits of

$400,000 to settle the matter.  (Def.'s App. Ex. M.)  Plaintiff notes that his treating neurosurgeon, Dr. David R. Oliver-Smith, rendered the opinion that this surgery was causally related to the October 22, 2013 accident and that he was at a 15% increased likelihood that he would require additional surgery in the future.  (Id. at 3.)

Paydem's supervisor responded that the "complex trigger" was at least $75,000 and he could not justify that reserve without additional records. (Pl.'s App. Ex. 8 at 137.)  On October 28, 2016, Paydem entered a note into the file indicating that Plaintiff's counsel had provided him with documentation regarding Plaintiff's March 24, 2016 cervical fusion. He amended his reserve to $100,000 and recommended reassigning the claim to the complex team. (Pl.'s App. Ex. 8 at 139.)

On November 3, 2016, Paydem wrote another evaluation note. In this note, he wrote:

On 03/24/2016 claimant underwent discectomy and fusion with plating on. There were complications (swallowing) and dr notes future surgery will likely be needed. He also notes that claimant is having anxiety/depression and physchological [sic] issues which he relates to mva. Surgeon relates surgery to the mva. [... ] Considering claimant's treatment and surgery + potential second surgery, I am estimating 50k in specials. [... ]
If claimant can prove all of his injuries being related to the mva of 10/22/2013, case has a value of 200k+.
current reserve 100k
I recommend to review for complex/nlc referral.

(Id. at 143.) The following day on November 4, 2016, Paydem wrote a diary entry in his claims file:

As far as all of the injuries being related or not, it is my opinion that not all of the claimant's injuries/treatment is related which I explained in my previous evaluation. But addition of fusion and recommendation for another surgery changes complexity of this case. Surgeon relates neck injury and surgery to the mva. [... ] We do not have actual operative report, cervical mri from 2015 and 2016. [Plaintiff's counsel] produced report from the surgeon who performed surgery and his opinion regarding the injury and treatment including surgery. If your concern whether the surgery was done or not, it was done on 03/24/2016. I recommend a [sic] reserving this claim at 200k+ at this time. Furthermore,

considering positive MRI, injections, cervical fusion, recommendation for another surgery and current+future specials/gd I recommend that this claim gets evaluated for NLC handling.

(Id.)[8] Paydem acknowledged that he does not have any medical training or education. (Paydem Dep. 26:18-22.) He indicated that as the adjustor he is allowed to disagree with a medical expert's opinion on causation and that it is something he has been trained on. (Paydem Dep. 165:14-21.) On November 4, 2016, Paydem's request that the reserve be amended to $200,000 was reviewed by a supervisor, Deanna Dimeo. The supervisor approved amending the reserve to $100,000 and stated: "I have approved the 100K reserve however this claim needs to have a higher reserve given the neck surgery." (Pl.'s App. Ex. 8 at 144.)

On November 9, 2016, the file was reassigned to Gillian Bressi. (Def.'s App. Ex. E at 147.) During her initial review of the claim, Bressi agreed with the reserve being set at $100,000, but did not set a higher reserve as Dimeo had believed was necessary. She sent the medical records to an in-house nurse to review. (Id.)

On November 9, 2016, Bressi wrote to Plaintiff's counsel acknowledging the demand or the full policy limits of $400,000 and stated that she was reviewing the file. (Def.'s App. Ex. N.) Bressi concluded that a nurse record review was warranted and Nurse Collen Mulgrew was requested to review the file and author a report. On January 10, 2017, Bressi received the report of Nurse Mulgrew, who summarized the medical records to date and suggested that Bressi obtain pre-accident records and films for review. She further recommended that Bressi follow up to ensure that she had all the treatment records as there were some gaps in the timeline. (Def.'s

---

[8] The reference to "NLC handling" refers to the "National Liability Claims" group. the NLC group typically handles claims with potential values in excess of $150,000. (Bressi Dep., Pl.'s App. Ex. 5, 11:20-12:20.)

App. Ex. E at 151; Ex. O.)  Plaintiff responds that Mulgrew's report also questioned the opinion of Dr. Oliver-Smith, stating that his report "appears speculative" and "leaves out important facts."  (Def.'s App. Ex. O at 3.)  She further stated that it "would likely be impossible at the point the letter was written to determine whether a future surgery would be necessary." (Id.) Bressi noted that the nurse's report also indicated that additional records and information were needed, including diagnostic films, family doctor records, and emergency room records.  (Def.'s App. Ex. E at 151.)

On November 28, 2016, Bressi sent correspondence to Plaintiff's counsel requesting prior medical records, an update on medical treatment, and wage loss documentation. (Def.'s App. Ex. P.)  On January 30, 2017, Bressi spoke with Plaintiff's attorney and advised that she would need additional documentation in order to finalize her evaluation of the claim. Bressi then sent correspondence to Plaintiff's counsel requesting additional records, including Plaintiff's prior treatment records, surgery records, diagnostic films, and tax returns in order to evaluate Plaintiff's wage loss claim. (Def.'s App. Ex. E at 151; Ex. Q.) On February 6, 2017, Bressi sent another letter requesting the same information. (Def.'s App. Ex. R.)

On March 1, 2017, Bressi called and spoke with Plaintiff's counsel about the status of the requested records. Plaintiff's counsel advised that he had requested the documents but had not yet received them. (Def.'s App. Ex. E at 152.) On April 21, 2017, Bressi sent another letter requesting an update on the records she had previously requested. (Def.'s App. Ex. S.) On April 25, 2017, Bressi spoke with Plaintiff's counsel again. She reminded him of their prior conversations, and he agreed to follow up for the requested medical records. (Def.'s App. Ex. E at 153.) On May 11, 2017, Plaintiff's counsel sent updated records, totaling about 1,000 pages.

On May 12, 2017, Bressi sent a letter to Plaintiff's counsel acknowledging receipt of

Plaintiff's updated records and advising that she was reviewing the file at that time. (Def.'s App. Ex. T.) On June 12, 2017, Bressi requested an update from the in-house nurses. (Def.'s App. Ex. E at 155.)

On June 15, 2017, Bressi sent correspondence to Plaintiff's counsel requesting pre-accident medical records and diagnostic films which were not provided on May 11, 2017. (Def.'s App. Ex. U.) On June 20, 2017, Bressi sent Plaintiff's x-rays and MRIs to Andrew Shaer, M.D., for review. (Def.'s App. Ex. E at 156.) On June 28, 2017, Dr. Shaer informed Bressi that he needed to review films from before the October 22, 2013 collision. Bressi requested those films from Plaintiff's counsel, who then attempted to obtain them. (Id.) Over the next several months, Plaintiff's counsel attempted to obtain the requested films, but at that time, it was determined that the films could not be obtained. A paralegal from Plaintiff's counsel's office signed an affidavit stating the unsuccessful efforts she made to obtain the films. (Def.'s App. Ex. E at 159; Ex. Y.)

Dr. Shaer reviewed the films and found that there were no findings resulting from the accident on the lumbar x-rays and MRI studies. (Def.'s App. Ex. V.) Defendant states that Dr. Shaer's report also indicates that there were no findings on the cervical spine x-rays resulting from the accident. Dr. Shaer also noted that a cervical herniation at C6-7 seen on the June 24, 2014 MRI was of indeterminate age and origin; a report from Plaintiffs prior cervical MRI from May 2012 indicated findings at this level, but the films were not available for Dr. Shaer's review. Finally, Dr. Shaer noted that the herniation at C5-6 seen on the June 30, 2015 MRI was not present on the prior MRI of June 24, 2014 and is therefore not related to the accident. The cervical discectomy and fusion in March 2016 was performed at C5-6 (where Dr. Shaer noted the herniation was not present immediately following the accident), and C6-7 (where Dr. Shaer

noted Plaintiff had prior cervical problems dating back to 2012).

Plaintiff responds that Bressi made her final offer of settlement on September 25, 2017, but Dr. Shaer's report is dated October 10, 2017, or more than two weeks later, and Bressi admitted that at the time she made the offer she did not have Dr. Shaer's report and did not know his interpretation of any of the x-rays. (Bressi Dep. 123.)[9] In addition, Dr. Shaer's review of the June 24, 2014 cervical MRI found "moderate sized central disc herniation resulting in cord impingement. This finding is of indeterminate age and origin. A causal relationship between it and the accident cannot be established on the basis of this examination." (Def.'s App. Ex. V.) Dr. Shaer could not offer any further opinion on the causation of Plaintiff's C6-7 disc herniation and cord impingement after review of pre-surgical MRIs of Plaintiff's cervical spine on June 30, 2015 and October 20, 2015. (Id.)

On July 18, 2017, Bressi sent correspondence to Plaintiff's counsel requesting an update on Plaintiff's injuries and treatment, as well as copies of Plaintiff's pre-accident diagnostic films. (Def.'s App. Ex. W.) Bressi also requested a supplemental nurse review of the updated records.

On August 15, 2017, Bressi received the second in-house nurse review report. This report was authored by both Nurse Mulgrew and a second nurse, Donna Wiesner. (Def.'s App. Ex. E at 158.) This second in-house nurse report included several additional opinions by Nurse Mulgrew and/or Nurse Wiesner regarding the issue of causation and the cervical fusion surgery:

> It appears that although the claimant could have sustained a cervical strain it does not appear that there was any injury to the cervical spine causing radiculopathy or myopathy which could be an indication for surgery. It does not appear that the surgery is related to the DOL but rather due to cervical spondylosis. Additionally the surgeon noted that the claimant could continue to have neck pain and that he was doing the surgery for prevention of cervical cord compression. It appears that surgery may have been unnecessary.

---

[9] Pl.'s App. Ex. 5.

(Def.'s App. Ex. X at 1.)[10]

On August 18, 2017, Bressi reviewed the updated report of Nurse Mulgrew and Nurse Donna Wiesner, wherein they noted pre-existing neck problems and recommended a review of the pre-accident diagnostic films. (Def.'s App. Ex. E at 158; Ex. X.) Plaintiff notes that the nurses offered opinions that they were clearly unqualified to render, including on surgical causation ("It does not appear that the surgery is related to the [date of loss] but rather due to cervical spondylosis") and even went so far as to suggest that "it appears surgery may have been unnecessary." (Def.'s App. Ex. X at 1.) He also points out that Bressi admitted that she compared the opinions of the nurses to that of Dr. Oliver-Smith and ultimately, she accepted these opinions of in-house nurses over that of Plaintiff's treating neurosurgeon, Dr. Oliver-Smith, on the issue of causation. (Bressi Dep. 88:13-22, 95:21-96:5.) She stated that they had more medical records than she believed Dr. Oliver-Smith had and therefore they "could give [her] a better opinion." (Id. at 95:19.)

On September 7, 2017, Plaintiff's counsel sent a letter confirming he was unable to obtain Plaintiff's pre-accident diagnostic films, and indicating that he believed that the manner in which Mid-Century had investigated this claim, the lengthy delay in doing so, and the failure to make a reasonable offer of settlement constituted bad faith that he would allege in a lawsuit against Mid-Century if it failed to "make a reasonable offer" prior to the expiration of the statute of limitations on October 22, 2017. (Def.'s App. Ex. Y.)

On September 19, 2017, Bressi sent her supervisor, Frances Kilcullen, her final evaluation note. (Def.'s App. Ex. E at 160; Exhibit OO.) Bressi elected to use the same "cut-off" or "end" date for Plaintiff's damages that Paydem used: January 30, 2014, the date of Dr.

---

[10] Bressi admitted that she herself has no nursing or medical training (Bressi Dep. 18:15).

Heinle's note memorializing the second incident. (Bressi Dep. 102:16-103:20, 113:8-23; Def.'s App. Ex. OO at 7.) Plaintiff notes that neither the first in-house nurse review authored by Nurse Mulgrew nor the second review authored by Nurses Mulgrew and Wiesner ever mention or render any opinions about the second incident. (Def.'s App. Exs. O, X.)

In her final evaluation note, Bressi estimated that Plaintiff's medical out-of-pocket loss to be between $0.00 and $20,000. (Def.'s App. Ex. OO at 5.) In her final evaluation note, Bressi reviewed Plaintiff's tax returns and, despite numerous notations in the records that Plaintiff was either unable to work or was limited in his capacity to work in his medical records and Dr. Oliver-Smith's opinions regarding his permanent limitations, came to the determination that Plaintiff had not suffered a single dollar of lost wages or decreased earning capacity as it relates to this claim. (Def.'s App. Ex. OO at 5; Bressi Dep. 111:8-12.)

In her final evaluation note, Bressi came to a settlement range of $5,000 to $15,000. (Def.'s App. Ex. OO at 7.) Bressi's supervisor agreed with Bressi's evaluation, including the "cut-off" date of January 30, 2014 and the settlement range of $5,000 to $15,000. (Kilcullen Dep. 135:25-136:15, 136:24-137:17.)

On September 25, 2017, Bressi spoke with Plaintiff's counsel and made an offer of $10,000 to settle Plaintiff's UM claim. (Def.'s App. Ex. Z.) This amount represented 10% of Bressi's reserve and 5% of Paydem's assessment that, if Plaintiff could prove that all his injuries and need for surgery was attributable to the October 22, 2013 collision, the claim would have a value in excess of $200,000. (Def.'s App. Ex. E at 160-61.) At the time Bressi made the $10,000 offer of settlement, she had not obtained an examination under oath from Plaintiff, or an independent medical examination, she had not received the radiology review of Plaintiff's films from Dr. Shaer and was not otherwise aware of Dr. Shaer's opinions and she had not had

Plaintiff's medical records reviewed by an independent medical doctor who had rendered her any opinion on any issue in the case, including causation and Plaintiff's need for cervical fusion surgery. (Bressi Dep. 123:4-15, 124:22-125:17.)

Bressi did not consider Paydem's evaluation that the claim could have a value in excess of $200,000 and she had never amended her reserve from $100,000. (Bressi Dep. 127:11-23.) She had never considered what the value of Plaintiff's claim would be if all of his claims were assumed to be true ("pure exposure value"). (Id. at 54:21-55:4.)

In response, on September 26, 2017, Plaintiff's counsel sent an email rejecting the offer and requested arbitration. (Def.'s App. Ex. Z.) On September 27, 2017, Bressi responded, stating that Mid-Century did not agree to arbitrate the claim, and contending that both parties must agree to arbitration pursuant to the policy. (Def.'s App. Ex. Z; see also Ex. C.) Plaintiff responds that Mid-Century has presented two versions of what it contends to be the arbitration clause in his policy: in one either party can request arbitration and in the other both parties must agree before arbitration can occur. (Pl.'s App. Exs. 9, 10.) Plaintiff's expert, John Kezer, has opined that either the first version applies (in which case Bressi misrepresented what the policy said) or the policy is ambiguous on the matter, in which case Mid-Century should have resolved the ambiguity by applying the terms most favorable to the insured. (Kezer Rpt. at 14-15.)[11]

Defendant contends that Bressi explained in detail the reasoning behind her offer of $10,000, including the questions surrounding the cause of Plaintiff's symptoms noted in his own medical records, and the fact that it was unclear whether Plaintiff's surgeon had reviewed all of his prior medical records. (Def.'s App. Ex. Z.) Plaintiff responds that Bressi's most succinct statement of her reasoning was that "we provided you with an offer of $10,000 to settle this

---

[11] Pl.'s App. Ex. 1.

claim based on my experience that the surgery has not yet been proven to be related to the motor vehicle accident of October 22, 2013." (Id. at 1.) Bressi requested Plaintiff's Examination Under Oath and indicated she would be scheduling him for an Independent Medical Examination. In response, Plaintiff filed suit.

On October 23, 2017, Bressi received a copy of Plaintiff's Complaint in Civil Action. (Def.'s App. Ex. E at 163.) On October 25,2017, Bressi received Dr. Shaer's report for the first time. (Id. at 164.)

Plaintiff's Prior Conditions

Defendant states that, prior to the accident October 22, 2013, Plaintiff had suffered from neck and back pain. (Lewis Dep. 31:14-18.) Plaintiff responds that his actual testimony was that "I have had lower back problems, just minor neck stuff here and there, but … it was mostly my lower back, which doesn't bother me anymore."

Plaintiff injured his neck and back in an accident in 2012 for which he underwent diagnostic studies and treatment. Plaintiff responds that he had a neck/back MRI performed in 2012, but that he never said that he injured his neck and back in an accident and Defendant cites no record support for its assertion.

Plaintiff was seen in the emergency room on April 27, 2012 for complaints of neck and back pain. (Def.'s App. Ex. BB.) Plaintiff had x-rays of his cervical and lumbar spine at that time. (Def.'s App. Ex. CC.) On May 15, 2012, Plaintiff underwent an NCV/EMG study because of neck pain and arm numbness. (Def.'s App. Ex. DD.) On May 15, 2012, Plaintiff also underwent a cervical spine MRI. (Def.'s App. Ex. EE.) Defendant states that Plaintiff previously received chiropractic care in and around 2011 and 2012 for neck and back pain. Plaintiff reported to the chiropractor in December 2011 that he was having pain "all the time" which interfered

with his work, sleep, daily routine, and recreational activities. (Def.'s App. Ex. FF.) Plaintiff responds that he received chiropractic care in 2011 and 2012, but his primary pain was in his lower back, with only minor neck involvement. (Lewis Dep. 31:14-18.)

Plaintiff also reported that he had pain between his shoulder blades running up into his neck, and that he has had back problems and sciatica for years. (Def.'s App. Ex. FF.) Plaintiff was diagnosed with multiple injuries to his neck and back, and as well as headaches. (Def.'s App. Ex. GG.) Plaintiff treated with the chiropractor for injuries to his neck and back. (Def.'s App. Ex. HH.)

Defendant states that between the time of the accident on October 22, 2013 and January 2014, Plaintiff was treating with a physical therapist and was improving. (Def.'s App. Ex. II.) Plaintiff responds that he did not get better, but only plateaued. (Lewis Dep. 40:12-13.)

On January 6, 2014, about 10 weeks after the accident, Plaintiff reported he was "doing better." (Def.'s App. Ex. JJ.) Plaintiff responds that this same record contains the notation that he "appears to be plateauing with physical therapy." (Id.)

On January 16, 2014, Dr. Heinle noted that Plaintiff had full active range of motion in the cervical spine. Dr. Heinle noted "no palpable muscle spasm appreciated," and Plaintiff was going to the gym and could "easily" lift 20 pounds overhead with one hand. (Def.'s App. Ex. KK.) Plaintiff responds that the record also contains Dr. Heinle's impression that he suffered a "cervical strain/sprain and thoracic strain/sprain, greater than the lumbar strain/sprain following a motor vehicle accident." (Id.)

On January 30, 2014, Plaintiff told Dr. Heinle that he was doing better until he was involved in another motor vehicle incident which aggravated his neck. (Def.'s App. Ex. LL.) Plaintiff responds that the record does not say anything about "aggravating," only that he

suffered increased cervical pain.

On December 15, 2014, Plaintiff presented to the emergency room and reported that he had increased pain in his neck with tingling into his right arm after loading garbage into the dumpster on Friday. (Def.'s App. Ex. MM.)

Plaintiff's MRI study on June 30, 2015 included additional findings in the cervical spine not present on the June 24, 2014 MRI study performed following the accident. (Def.'s App. Ex. V.) Plaintiff responds that Defendant is referring (without acknowledging it) to Dr. Shaer's October 10, 2017 report, which neither Paydem nor Bressi had seen prior to making either the first or second/final settlement offers in this case.

Defendant states that Plaintiff did not undergo a surgical procedure until 2½ years after the accident. Plaintiff's counsel did not provide Mid-Century with his surgery record until October 2016, about 7 months after the surgery. Upon receipt of the surgery record, Mid-Century followed up with Plaintiff's counsel for additional records and information on multiple occasions. Mid-Century also requested that Nurse Mulgrew review the records, and she recommended additional information that was needed. (Def.'s App. Ex. O.) Mid-Century also requested that Plaintiff provide his prior diagnostic studies for review. In May 2017, more than 7 months after providing the surgery record, Plaintiff's counsel provided approximately 1,000 pages of records for review and consideration of Plaintiff's UM claim.

Defendant contends that it diligently reviewed and considered each of these records, followed up with Plaintiff's counsel for additional information, and requested that Dr. Shaer review the MRI films. Plaintiff responds that this description falsely suggests that Paydem and/or Bressi saw Dr. Shaer's report prior to making settlement offers, when they did not.

Mid-Century also requested a supplemental nurse review of the records. (Def.'s App. Ex.

X.) When asked about the nurse review reports, Bressi stated: "I used it as an opinion to help me with my investigation going forward...." (Bressi Dep. 87:22-23.) Plaintiff responds that Bressi admitted that she compared the opinions of two in-house nurses with those of Plaintiff's treating neurosurgeon and, because the nurses had access to more of Plaintiff's medical records, she believed that the nurses could "give [her] a better opinion." (Bressi Dep. 95:19.) She stated that "I was not giving as much weight to the surgeon's report. It just didn't prove enough." (Id. at 92:21-23.) Ultimately, she admitted that she accepted the opinions of her in-house nurses over Plaintiff's treating neurosurgeon on the issue of causation. (Id. at 95:21-96:5.)[12]

Bressi also testified that she looked at all of the information she had gathered, including the nurse review report, when performing her investigation. (Bressi Dep. 88:6-18.) Plaintiff responds that Defendant is implying that Bressi had knowledge regarding and/or an expert report detailing Dr. Shaer's opinions regarding Plaintiff's x-rays and MRIs, which she did not.

Bressi further testified stated: "[The report] aided in my assessment; but there were also other outstanding things at the time." (Id. at 90:22-23.) Plaintiff responds that this one sentence does not accurately indicate Bressi's testimony about these reports.

Furthermore, Bressi testified that she took everything into consideration, and she believed Dr. Oliver-Smith's opinion was not complete because his report did not indicate that he had reviewed Plaintiff's prior records. (Id. at 91:14-16.)

Bressi testified that the only information provided to her regarding Plaintiff's wage loss were his tax returns from 2011 through 2015. There was no vocational report provided. (Id. at

---

[12] Defendant cites to another section of her deposition in which Bressi responded "that is not true" to the question whether she gave more weight to the nurses' reports than that of Dr. Oliver-Smith (Bressi Dep. 94:21). However, because Bressi's testimony is inconsistent on this issue, the Court will draw the inference in favor of Plaintiff as the non-moving party. A trial, Defendant can attempt to reconcile these differences and the trier of fact will have to resolve the matter.

105:13-23.) Plaintiff responds that those documents were not the "only information provided to her regarding Plaintiff's wage loss." Plaintiff's medical records contain numerous indications that Plaintiff was not working and/or was limited by his injuries in his capacity to work. (Def.'s App. Ex. LL.)

Defendant states that Plaintiff had a wage increase in 2014. (Bressi Dep. 106:5-7.) Plaintiff responds that, at the time of the motor vehicle collision on October 22, 2013, he owned numerous properties and was employed buying, renting, and flipping houses. After the collision, he was unable to continue performing the reconstruction work himself. While he has attempted to supervise other individuals at times, in large measure he has not been able to work since the collision. His income following these injuries consisted primarily of rental income and income from the sale of properties he already owned. To the extent that Plaintiff's reportable income on a federal income tax return increased from 2013 to 2014, it would have only demonstrated that Plaintiff's rental and/or property sale income had increased. In fact, Plaintiff experienced a loss of income as he could no longer renovate houses to sell them for a profit. (Lewis Dep. 18:14-16; Pl.'s App. Ex. 2 at 8-9.)

Plaintiff has submitted expert reports that his economic loss as a result of these injuries is not only in excess of the applicable policy limits of $400,000, but is in excess of $600,000. (Hanak Report, Pl.'s App. Ex. 2.) Plaintiff's non-economic loss related to the nature of his physical injuries and his pain and suffering is valued between $350,000 and $500,000. (Faldowski Report, Pl.'s App. Ex. 3.)

Bressi noted in her evaluation that Plaintiff's complaints of radicular pain were "new," according to his doctor, as of October 16, 2015. (Def.'s App. Ex. OO.) Bressi also noted that Plaintiff was treated for neck and back pain prior to the accident. Bressi noted that Plaintiff

reported an incident in January 2014 where he had increased pain. She also noted another incident in December 2014 where Plaintiff reported neck pain after loading garbage into a dumpster.

Defendant states that Bressi noted that Plaintiff denied a prior history of neck pain in all of his records, including to Dr. Oliver-Smith, his surgeon. (Id.) Plaintiff indicates that he cannot discern the meaning of "denied a prior history in all of his records" and therefore denies this statement.

Procedural History

Plaintiff filed this action on October 12, 2017 in the Court of Common Pleas of Allegheny County, Pennsylvania. Count I alleges a claim of breach of contract and Count II alleges bad faith in violation of 42 Pa. C.S. § 8371.

On October 31, 2017, Defendant removed the case to this Court on the basis of diversity jurisdiction in that: Plaintiff is a Pennsylvania citizen; Mid-Century is a California corporation with its principal place of business in Woodland Hills, California; and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00. (Notice of Removal ¶¶ 2-7.) 28 U.S.C. § 1332.

On October 30, 2018, Defendant filed the pending motion for partial summary judgment (ECF No. 39). On November 30, 2018, Plaintiff filed a brief in opposition (ECF No. 43) and on December 14, 2018, Defendant filed a reply brief (ECF No. 52).

Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may

be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that Plaintiff merely disagrees with the handling of his UM claim, but points to no evidence to support his contention that Mid-Century acted in bad faith. Plaintiff responds that the misreading of his records by Paydem and Bressi and the decision to terminate all potential benefits based on the second incident constituted bad-faith efforts to deny his UM claim, or at the very least, there are genuine issues of material fact about this matter which

preclude Defendant's motion for summary judgment as to the bad faith claim.

Bad Faith Claims

Pennsylvania's bad faith statute provides that:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

> (2) Award punitive damages against the insurer.

> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371.  A bad faith claim is distinct from the underlying contractual insurance claims from which the dispute arose.  Nealy v. State Farm Mut. Auto. Ins. Co., 695 A.2d 790, 792 (Pa. Super. 1997), appeal denied, 717 A.2d 1028 (Pa. 1998).  The Court of Appeals for the Third Circuit has recognized that "bad faith is actionable regardless of whether it occurs before, during or after litigation.... [Moreover], using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under Section 8371."  W.V. Realty, Inc. v. Northern Ins. Co., 334 F.3d 306, 313 (3d Cir. 2003) (citing O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906, 908 (Pa. Super. 1999)).

The Pennsylvania Superior Court has stated that:

> To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. Terletsky v. Prudential Property and Casualty Insurance Company, 437 Pa. Super. 108, 649 A.2d, 680, 688 (1999). Bad faith claims are fact specific and depend on the conduct of the insurer vis à vis the insured. Williams v. Nationwide Mutual Ins. Co., 750 A.2d 881, 887 (Pa. Super. 2000).

Condio v. Erie Ins. Exchange, 899 A.2d 1136, 1143 (Pa. Super.), appeal denied, 912 A.2d 838 (Pa. 2006).  In that case, the court examined the question of the application of § 8371 to UM and

underinsured motorists ("UIM") benefit claims (together, "U-claims"):

> Pennsylvania law holds insurers to a duty of good faith and fair dealing toward their insureds, O'Donnell, 734 A.2d at 905; Bonenberger, 791 A.2d at 381, without distinguishing between first party and third party settings…. U-claims contain elements of both first party and third party claims. We see no reason, therefore, to impose a different duty on an insurance company in a U-claim setting. While the legal relationship of the parties may change in the context of a U-claim, i.e., become adversarial, the insurer's duty does not change. We hold that, when faced with a U-claim, an insurance company's duty to its insured is one of good faith and fair dealing. It goes without saying that this duty does not allow an insurer to protect its own interests at the expense of its insured's interests. Nor does it require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit.

Id. at 1144-45.

Recently, the Pennsylvania Supreme Court held that "proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371." Rancosky v. Washington Nat'l Ins. Co., 170 A.3d 364, 377 (Pa. 2017). Thus, as Plaintiff notes, to the extent that Defendant relies upon statements in the Terletsky case which may have suggested that a policyholder has to demonstrate that an insurance company acted "with a dishonest purpose" or "through some motive of self-interest or ill-will" in order to recover on a bad faith claim, this argument is no longer viable. Defendant cites cases that rely upon the additional requirement of proving "self-interest" or "ill-will" (ECF No. 39 at 3-5) and are no longer good law in light of Rancosky.

Plaintiff notes that the Pennsylvania Unfair Practices Act prohibits an insurance company from, inter alia:

> Refusing to pay claims without conducting a reasonable investigation based upon all available information.
>
> …
>
> Not attempting in good faith to effectuate prompt, fair and equitable

settlements of claims in which the company's liability under the policy has
become reasonably clear.

Compelling persons to institute litigation to recover amounts due under an
insurance policy by offering substantially less than the amounts due and
ultimately recovered in actions brought by such persons.

40 P.S. § 1171.5(a)(10)(iv, vi, vii).

Plaintiff cites a case which stated that:

Generally speaking, Pennsylvania law does not treat as bad faith an insurer's low
but reasonable estimate of an insured's losses. Nevertheless, low-ball offers which
bear no reasonable relationship to an insured's actual losses can constitute bad
faith within the meaning of § 8371. The dispositive question is whether a
reasonable jury could conclude, on the basis of clear and convincing evidence,
that the Defendant acted in bad faith by offering to settle [the insured's] case for
significantly less than the amount of her actual losses.

Barry v. Ohio Cas. Grp., 2007 WL 128878, at *8 (W.D. Pa. Jan. 12, 2007) (citing Brown v.

Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. 2004)).  In Hollock v. Erie Insurance

Exchange, 842 A.2d 409 (Pa. Super. 2004) (en banc), the court held that the insurer acted in bad

faith when the insured was ultimately awarded 29 times more than was offered in settlement.

The court also held that the UIM adjuster arbitrarily refused to accept causation of the claimant's

injuries after the first-party adjuster accepted and paid personal injury protection benefits.  Id. at

412.  See also Schifino v. GEICO Gen. Ins. Co., 2012 WL 6552839 (W.D. Pa. Dec. 14, 2012)

(denying summary judgment on bad faith claim alleging failure to conduct a meaningful

investigation and unreasonably low offers of settlement); Bonenberger v. Nationwide Mut. Ins.

Co., 791 A.2d 378, 380 (Pa. Super. 2002) (affirming a finding of bad faith when insurer's offer

of settlement was 9% of the ultimate value of the claim).

Plaintiff points to the following facts in support of his bad faith claim:

1) On July 11, 2014, Paydem misrepresented medical records to suggest that a doctor had

indicated that Plaintiff was getting better and physical therapy could be discontinued, when the

actual note was from a physical therapist who merely stated that he "plateaued" and that there was no recommendation for him to stop therapy.

2) Paydem wrote that, during a visit on January 30, 2014, Dr. Heinle diagnosed Plaintiff as having "re-aggravated" his neck in a subsequent incident, but Dr. Heinle never made such a diagnosis.

3) On December 1, 2015, Paydem concluded that the second incident constituted a "subsequent loss" and refused to accept any care or treatment after January 30, 2014 as relating to the motor vehicle accident in this case and, while admitting that, if a factfinder believed that all of Plaintiff's injuries were related to the collision, the claim would have a value in excess of $50,000, but he set the reserve at $10,000 and offered a settlement of only $5,000, less than ten percent of his estimate of the total exposure.

4) Paydem admitted that, when he made his offer, he had no information other than Dr. Heinle's January 30, 2014 note, he did not even know the date of the second incident and he did not have any medical basis regarding the issue of causation.

5) After Paydem learned about the March 24, 2016 cervical fusion operation, he amended the reserve to $100,000 and recommended reassigning the claim to the complex team which handled claims with a value in excess of $150,000, but he also rejected Dr. Oliver-Smith's opinion on causation without even obtaining the opinion of an independent medical expert.

6) After the claim was reassigned to her, Bressi obtained two reports from in-house nurses, who rejected Dr. Oliver-Smith's opinion on causation and concluded that the surgery was not due to the collision and was "unnecessary."

7) Bressi then relied upon the two nurse reports over the opinion of Dr. Oliver-Smith because she concluded that he had not made a "complete" review.

8) Bressi, like Paydem, refused to consider any injuries or damages after January 30, 2014, which she arbitrarily chose as the cut-off date.[13]

9) Bressi concluded, despite numerous notations in the records that Plaintiff was either unable to work or was limited in his capacity to work, that he had not suffered a single dollar of wage losses or decreased earning capacity.

10) Bressi never stated a specific amount of damages she was attributing to pain and suffering, but came to a settlement range of $5,000 to $15,000, despite not having obtained an examination under oath or an independent medical exam, did not have his records reviewed by a medical doctor, had not received the radiology review of Plaintiff's films from Dr. Shaer,[14] did not consider Paydem's evaluation that the claim could have a value in excess of $200,000, never amended her reserve from $100,000 and did not consider the total potential value of the claim should a factfinder conclude that all of Plaintiff's injuries were related to the collision.

11) Bressi made a final offer of $10,000 despite all of the information cited above.

12) Bressi insisted that the policy required both parties to consent to arbitration, even though it had inconsistent provisions regarding this issue and she failed to construe any ambiguity in favor of the insured.[15]

---

[13] Defendant argues that this date is "based upon Plaintiff's own medical records" (ECF No. 52 at 6), but does not elaborate on what this means. As explained above, that is the date of Dr. Heinle's note about the second incident, but it does not even indicate when this incident occurred.

[14] As Plaintiff observes, Defendant's expert report repeats this misrepresentation that Bressi relied upon Dr. Shaer's report, which is impossible because she had not seen the report at the time she made her final offer of settlement. (Heinze Report, Def.'s App. Ex. PP, at 11, 14.)

[15] In its reply brief, Defendant contends that the arbitration provision that it originally submitted with its motion for summary judgment (Def.'s App. Ex. C at 9) is in reality an "old, unrelated form document" that was inadvertently submitted to Plaintiff with its initial disclosures (ECF No. 52 at 10). Again, for purposes of this motion, to the extent that there is a discrepancy within Defendant's own evidence, the Court will draw all inferences in favor of Plaintiff as the non-moving party. At trial, Defendant can explain to the trier of fact which arbitration provision is

Defendant argues that these issues constitute mere disagreements by Plaintiff with the amount offered to him by Mid-Century with respect to his UM claim. However, if accepted by the trier of fact, these points, both singly and more importantly considered as a whole, would represent a continuing pattern of acts that were not in good faith.

Defendant argues that Plaintiff cannot challenge the fact that it did not request an examination under oath or independent medical examination during the handling of his claim, because the manner in which a claim is handled does not constitute bad faith so long as it is reasonable. Krisa v. Equitable Life Assurance Society, 113 F. Supp. 2d 694, 704 (M.D. Pa. 2000). Defendant may be correct that an insured cannot dictate the manner in which an investigation is conducted, but in this case Plaintiff has alleged and presented evidence that the manner in which it was conducted was not reasonable.

Plaintiff has identified numerous instances in which Mid-Century's actions could be considered lacking a reasonable basis to severely undervalue his UM benefits claim and arbitrarily terminate it as of January 30, 2014. There are genuine issues of material fact and credibility determinations that must be presented to the trier of fact and Defendant's motion for partial summary judgment will be denied.

An appropriate order follows.

---

the operative one for this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN P. LEWIS, | ) | |
|         Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 17-1409 |
| | ) | |
| MID-CENTURY INSUANCE COMPANY, a | ) | Magistrate Judge Mitchell |
| wholly-owned subsidiary of FARMERS | ) | |
| INSURANCE GROUP, | ) | |
|         Defendant. | ) | |

ORDER

AND NOW, this 17th day of April, 2019, for the reasons explained in the opinion above,

IT IS HEREBY ORDERED that the motion for partial summary judgment filed by

Defendant, Mid-Century Insurance Company (ECF No. 39), is denied.

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge