# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN P. LEWIS, | ) | **CIVIL ACTION** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No.: 2:17-cv-01409-RCM** |
| | ) | |
| MID-CENTURY INSURANCE | ) | |
| COMPANY, a wholly owned subsidiary | ) | |
| of FARMERS INSURANCE GROUP | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PLAINTIFF FROM PRESENTING THE EXPERT TESTIMONY OF DAMON FALDOWSKI, ESQUIRE, AT TRIAL

AND NOW, comes Plaintiff, Shawn P. Lewis (hereinafter, "Plaintiff"), by and through his attorneys, Andrew G. Rothey, Esquire, and Rosen Louik & Perry, P.C., and files the following Brief in Opposition to Defendant's Motion in Limine to Preclude Plaintiff from Presenting the Expert Testimony of Damon Faldowski, Esquire, at Trial.

### Procedural History

This case involves claims for breach of contract and insurance bad faith arising out of a motor vehicle collision on October 22, 2013 ("Collision"), wherein Plaintiff suffered injuries to various discs in his spinal column. As a result of these injuries, Plaintiff made a claim for uninsured (UM) benefits. Plaintiffs allege that Defendant Mid-Century Insurance Company (hereinafter, "Defendant") *inter alia* failed to timely evaluate Plaintiff's claim, failed to conducted an adequate investigation into the claim, and failed to make a fair and equitable offer of settlement in violation of its contractual duties under Plaintiff's policy and statutory duties under 42 Pa.C.S.A. § 8371.

1

Plaintiffs have produced the expert report of Hon. (Ret.) Damon Faldowski. (report attached to Defendant's Motion in Limine to which this brief is responsive). Defendant now seeks to preclude Judge Faldowski from testifying at trial.

**Statement of Facts**

To understand the relevance of Judge Faldowski's testimony, Plaintiff believes the Court would benefit from a factual summary surrounding the offers of settlement made by Defendant.[1] As a result of the Collision on October 22, 2013, Plaintiff asserted a civil claim for his injuries. Soon after the Collision, it was determined that the third-party tortfeasor was uninsured. As a result, Plaintiff asserted a UM claim under his own insurance policy with Mid-Century Insurance, which is part of the Farmers Insurance Group. On April 22, 2014, Plaintiff's claim was reassigned to an adjuster named Lyubomir Paydem ("Mr. Paydem"). Shortly thereafter, Mr. Paydem began his initial assessment of the claim. Regarding coverages, he determined that Plaintiff had full-tort with UM policy limits of $100,000. Subsequently, it was determined that Plaintiff had stacking. With four (4) vehicles on his policy, the correct UM policy limits were $400,000.

In assessing the liability of the claim, Mr. Paydem determined from the facts of the accident that the third-party tortfeasor was 100% liable for this collision. Thus, he determined that Plaintiff had a valid UM claim. Because the third-party tortfeasor had no insurance, there would be no set-off from any third party coverage.

During his review, Mr. Paydem learned that Plaintiff had suffered a soft-tissue injury to his neck and was getting chiropractic treatments. He learned that Plaintiff had exhausted his

---

[1] This factual summary is not to be considered exhaustive. There are numerous other facts that support Plaintiff's claim for bad faith that are not pertinent to the admissibility of Judge Faldowski's testimony.

personal injury protection coverage. He set his initial reserve for the claim at ▇▇▇ based on the nature of Plaintiff's injury and his potential out of pocket loss and wage loss.

As Plaintiff proceeded through conservative treatment modalities (chiropractic care, physical therapy, pain injections), Plaintiff's counsel provided Defendant with copies of Plaintiff's medical records. In a subsequent evaluation note on December 1, 2015, Mr. Paydem evaluated the claim's general damages. Mr. Paydem wrote in his claim note that if Plaintiff could prove all of his injuries were caused by the Collision, the claim would have a value in excess of ▇▇▇ However, Mr. Paydem, based solely on his own interpretation of Plaintiff's medical records, concluded that an incident in late January of 2014 where Plaintiff was in a car that had to stop suddenly and he felt neck pain afterwards was a "subsequent loss" and refused to accept any of the care and treatment after January 30, 2014 as related to the Collision. Mr. Paydem set his settlement range at ▇▇▇ to ▇▇▇. On December 1, 2015, he offered $5,000.

On March 24, 2016, David Oliver-Smith, M.D., a neurosurgeon, performed a C5-6, C6-7 anterior cervical discectomy and fusion with plating. Initially, the surgery was successful, but Plaintiff developed a post-operative hematoma which caused dysphagia. Dr. Oliver-Smith elected to monitor the hematoma conservatively. However, on April 15, 2016, Plaintiff returned complaining of increased pressure in his neck. He was diagnosed with a wound infection and instructed to proceed immediately to Allegheny General Hospital for a second procedure to debride the infected wound. Plaintiff spent approximately the next eight (8) weeks on antibiotics with in-home nursing care.

On April 12, 2016, Plaintiff's counsel informed Mr. Paydem that Plaintiff had undergone surgery for his neck injuries. As a result of this new information, Mr. Paydem requested that the

3

claim be reassigned to the National Liability Claims unit due the greater complexity and increased

potential exposure.  Notably, Defendant's "complex trigger" to refer claims was at least ███████.

By letter dated October 19, 2016, Plaintiff's counsel demanded the full policy limits of

$400,000 and provided a narrative report from Plaintiff's treating neurosurgeon in which Dr.

Oliver-Smith opined that the injuries Plaintiff sustained in the Collision caused his need for

cervical fusion surgery.

In subsequent notes in the claims file on October 28, November 3, and November 4, 2016,

Mr. Paydem estimated the claim would have ██████ in special damages, amended his reserve to

██████, and evaluated the potential value of the claim as being in excess of ██████.  He

recommended setting a reserve on the claim over ██████.  Mr. Paydem's supervisor approved

amending the reserve of ██████.  Thereafter on November 9, 2016, the claim was reassigned to

a new adjuster, Gillian Bressi.

Over approximately the next eleven (11) months, Plaintiff's counsel continued to provide

Ms. Bressi with updated medical records.  Ms. Bressi requested two in-house nurses review

Plaintiff's medical records.  She never requested or obtained an examination under oath or an

independent medical examination.  She requested a radiologist review Plaintiff's radiology films,

but had not received the results of his review at the time she made her final offer of settlement.

Ms. Bressi elected to use the same "cut-off date" for Plaintiff's damages that Mr. Paydem used:

January 30, 2014.  She refused to accept or consider any injuries or damages, including the

cervical fusion surgery, after that date.  She refused to accept Dr. Oliver-Smith's opinion on

causation of Plaintiff's cervical fusion surgery.

Despite numerous notations in the records that Plaintiff was either unable to work or was

limited in his capacity to work in his medical records and Dr. Oliver-Smith's opinions regarding

his permanent limitations, Ms. Bressi reviewed Plaintiff's tax returns and came to the

determination that Plaintiff had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ as it relates to this claim.  Despite the aforementioned notations in the claims file

that the claim could have a value in excess of ▮▮▮▮▮, Ms. Bressi came to a settlement range of

▮▮▮▮ to ▮▮▮▮.  On September 25, 2017, less than a month before the expiration of the statute

of limitations, she offered $10,000 to settle Plaintiff's claim.  This litigation followed.

**Argument**

*Judge Faldowski is Not Barred from Testifying under Rule 702 or the* Daubert *Standards*

Defendant argues that Plaintiff should not be permitted to call Judge Faldowski, because

he is not qualified under F.R.E. 702 and the *Daubert* standards to testify in Pennsylvania.  *See*

Defendant's Motion in Limine (Doc 77), ¶ 18.  Defendant argues that Judge Faldowski should not

be permitted to testify as an expert for the following three (3) reasons:  (1) Defendant argues

Judge Faldowski does not have the requisite qualifications to render his opinions;  (2) Defendant

argues that Judge Faldowski's opinions usurp the role of the jury; and  (3) Defendant argues that

Judge Faldowski impermissibly relied on the report of David Oliver-Smith, M.D.  Plaintiff will

address these arguments *in seriatim*.

Rule 702 governs the permissible testimony by expert witnesses: "A witness who is

qualified as an expert by knowledge, skill, experience, training, or education may testify in the

form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or <u>other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;</u>

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

5

(d)      the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702 (emphasis added).  As this Court is well aware, in 1993 the Supreme Court decided the

landmark decision of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  The Court

held that "under the Rules the trial judge must ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable." *Id.*, at 589.  The high Court also went on to

state that there should be a connection or "fit" between the testimony and the issues of the case.

*Id.*, at 589.  "The testimony's underlying reasoning or methodology must be scientifically valid

and thereby reliable as evidence to be applied to the facts at issue." *Id.*, at 582.  Some of the

factors the Supreme Court considered are:  (1) whether the theory or technique in question can be

tested (and has been tested);  (2) whether it has been subjected to peer review and publication;  (3)

whether its potential rate of error is known and is it statically significant and acceptable; and  (4)

that general acceptance can yet have a bearing on the inquiry. *Id.*, at 593-594.  The fourth factor

incorporates the *Frye* test as a component, though no longer a dispositive one, of the analysis. *See*

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

      The *Daubert* Court concluded: "The inquiry envisioned by Rule 702 is, we emphasize, a

flexible one.  Its overarching subject is the scientific validity -- and thus the evidentiary relevance

and reliability -- of the principles that underlie a proposed submission.  The focus, of course, must

be solely on principles and methodology, not on the conclusions that they generate." *Daubert*,

509 U.S. at 594-95.  In a subsequent case, the Court elaborated on the "gatekeeping function" of

the trial judge:

> The objective of that requirement is to ensure the reliability and relevancy of
> expert testimony.  It is to make certain that an expert, whether basing testimony
> upon professional studies or personal experience, employs in the courtroom the
> same level of intellectual rigor that characterizes the practice of an expert in the
> relevant field.  Nor do we deny that, as stated in *Daubert*, the particular questions

6

> that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999). The Third

Circuit has "eschewed imposing overly rigorous requirements of expertise and have been satisfied

with more generalized qualifications." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741 (3d Cir.

1994). Expert qualifications, both substantive and formal, should be liberally construed. *Id.* The

trial court's determinations on expert testimony is reviewed under an abuse of discretion standard.

*See General Electric Co. v. Joiner*, 522 U.S. 136 (1997).

### Judge Faldowski's Qualifications and Methodology

Taking Defendant's arguments in turn, Judge Faldowski's qualifications to render his

opinions on the value of Plaintiff's claim are extensive. As detailed in his report and his

*curriculum vitae*, for nearly forty (40) years, Judge Faldowski was a private attorney practicing

medical malpractice and personal injury law, representing both plaintiffs and defendants. He

served as a mediator and arbitrator, including for the United States District for the Western

District. In 2016, he was appointed by Pennsylvania Governor Tom Wolf to the Court of

Common Pleas. He left the bench when his term ended in December 2017. He now maintains a

practice focused on private mediation. In terms of assessing personal injury claims, there is very

little that Judge Faldowski has *not* done. As such, he possesses the necessary training, education,

and experience to possess the "specialized knowledge" required by F.R.E. 702.

Defendants argue that Judge Faldowski does not have any medical training and should be

precluded on that basis. *See* Defendant's Motion in Limine (Doc 77), ¶ 32. This argument is

without merit.  Plaintiff does not seek to have Judge Faldowski render opinions of a medical

nature.  Indeed, Judge Faldowski reviewed and relied upon Plaintiff's medical records and Dr.

Oliver-Smith's report for any medical opinions relevant to his value analysis.

Furthermore, Judge Faldowski followed the very same methodology that is ubiquitous in

evaluating personal injury claims:  collect documents relevant to the claim (medical records,

medical bills, police reports, etc.), review those documents, and make an assessment on liability,

causation, and damages.  Defendant appears to mock this methodology by placing it in quotation

remarks, but fails to find any fault in it or to suggest an alternative methodology.  *See* Defendant's

Motion in Limine (Doc 77), ¶ 33.  Indeed, it is the very same approach that Defendant's adjusters

took in evaluating Plaintiff's claim.

*Judge Faldowski's Testimony Does Not Invade the Province of the Jury*

Defendant argues that Judge Faldowski's testimony would invade the province of the jury.

*See* Defendant's Motion in Limine (Doc 77), ¶ 34-36.  Defendant is wrong.  Plaintiff has alleged

multiple theories upon which a jury could make a finding of bad faith against the Defendant, but a

key contention is that Defendant arbitrarily failed to make a fair and equitable offer of settlement

based upon the information known to Defendant at the time the offers were made.  As noted

*supra,* prior to litigation, Defendant's adjusters made two offers of settlement:  $5,000 and

$10,000.  The issue before this jury is what was the reasonable settlement value of the case in this

jurisdiction based on all available information at the time the offers were made.  Settlement value

differs from verdict value,[2] and the jury needs expert guidance on that issue.

---

[2] The jury will not try the "case within the case" and will not be charged with responsibility for determining the jury verdict value of the case.

The knowledge, skill, and experience necessary to evaluate the settlement value of a personal injury claim is not within the general knowledge of a lay person. Often, it is particularly difficult for a lay person to assess non-economic damages. The very reason individuals with personal injury claims so frequently retain attorneys to represent them is, *inter alia,* their inability to properly assess the claim's value. As any trial attorney can attest, settlement value is not exact, but with experience, ranges can be identified.

Because a lay jury is ill-equipped to assess what a fair and equitable settlement value would be, Judge Faldowski's testimony will assist the jury in determining a fair and equitable settlement value. The jury will be able to compare the disparity between the offers of settlement ($5,000 and $10,000) with Defendant's reserve on the file (█████), Defendant's own internal valuations (██████████), and Judge Faldowski's valuation range ($350,000 to $500,000). The jury will then be able to assess whether the difference in those values amounts to bad faith on the Defendant's part.

*Judge Faldowski's Reliance on the Report of David Oliver-Smith, M.D.*

F.R.E. 703 permits an expert to base an opinion on "facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Under Rule 703, experts in one field may rely on data or opinions of experts in other fields. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 271 (W.D. Pa. 2012)(holding "it is well-settled that one expert may rely upon another expert's opinion in formulating his own"); *See also Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)("Now it is common in technical fields for an expert to base an

9

opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert").

A personal injury valuation expert, such as Judge Faldowski, is permitted to rely on the findings and opinions of a claimant's treating physicians. Defendant does not even attempt to argue otherwise, but rather objects to Dr. Oliver-Smith's opinions as unreliable.[3] Judge Faldowski's reliance on his opinions is neither misplaced nor impermissible. As such, Defendant's motion must be denied.

*Conclusion*

For all of the foregoing reasons, Defendant's Motion in Limine should be denied.


WHEREFORE, Plaintiff respectfully requests this Honorable Court enter an order denying Defendant's Motion in Limine.

Respectfully submitted,

ROSEN LOUIK & PERRY, P.C.


By:    s/Andrew G. Rothey
          Andrew G. Rothey, Esquire
          Pa. I.D. #319108
          *Attorneys for Plaintiff*

The Frick Building, Suite 200
437 Grant Street
Pittsburgh, PA   15219
412-281-4200
Fax:  412-281-2997
Email:  arothey@caringlawyers.com

---

[3] Plaintiff will address Defendant's objections to Dr. Oliver-Smith's testimony in a separate brief.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within PLAINTIFF'S BRIEF IN

OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PLAINTIFF FROM

PRESENTING THE EXPERT TESTIMONY OF DAMON FALDOWSKI, ESQUIRE, AT

TRIAL was served upon all counsel of record by United States first-class mail, postage prepaid,

facsimile, electronic mail or hand delivery, on the 6th day of January, 2020, as follows:

Rosemary A. Marchesani, Esquire
Cipriani & Werner
650 Washington Road, Suite 700
Pittsburgh, PA   15228
Email:  rmarchesani@c-wlaw.com
Fax:  412-563-2080
*(Co-Counsel for Defendant, Mid-Century Insurance)*

Hema Patel Mehta, Esquire
Susan J. French, Esquire
Chartwell Law
One Logan Square, 26th Floor
130 North 18th Street
Philadelphia, PA   19103
Email:  hmehta@chartwelllaw.com
Email:  sfrench@chartwelllaw.com
Fax:  215-972-7008
*(Co-Counsel for Defendant, Mid-Century  Insurance)*

ROSEN LOUIK & PERRY, P.C.

By:___ s/Andrew G. Rothey_____
Andrew G. Rothey, Esquire
*Attorneys for Plaintiff*